UNITED  STATES  DISTRICT  COURT

EASTERN DISTRICT OF CALIFORNIA

GENEVA  JOAN  EVRETT,                )  1:07-cv-00563-SMS
                                     )
                    Plaintiff,       )  DECISION AND ORDER GRANTING
       v.                            )  PLAINTIFF'S SOCIAL SECURITY
                                     )  COMPLAINT (DOC. 1)
MICHAEL J. ASTRUE,                   )
Commissioner of Social               )  ORDER REMANDING THE MATTER
Security,                            )  PURSUANT TO SENTENCE FOUR OF 42
                                     )  U.S.C. § 405(g) TO THE
                    Defendant.       )  COMMISSIONER FOR AWARD OF
                                     )  BENEFITS TO PLAINTIFF
_____    )
                                        ORDER DIRECTING THE ENTRY OF
                                        JUDGMENT FOR PLAINTIFF


        Plaintiff is proceeding in forma pauperis and with counsel

against the Commissioner of Social Security. Pursuant to 42

U.S.C. §§ 405(g) and 1383(c)(3), Plaintiff seeks judicial review

of a final decision of the Commissioner denying an application

for Supplemental Security Income (SSI) benefits under Title XVI

of the Social Security Act (the Act). Pursuant to 28 U.S.C. §

636(c)(1), the parties have consented to the jurisdiction of the

Magistrate Judge to conduct all proceedings in this matter,

1  including ordering the entry of final judgment.[1] The matter is
2  currently before the Court on the parties' briefs, which have
3  been submitted without oral argument to the Honorable Sandra M.
4  Snyder, United States Magistrate Judge.

5      I. Procedural Summary

6      On October 22, 2003, Plaintiff, who was born on April 13,
7  1956, applied for Supplemental Security Income (SSI), alleging
8  disability due to back pain and numb hands since July 1, 2002.
9  (A.R. 13, 65-67, 75.) After Plaintiff's claim was denied
10 initially and on reconsideration, Plaintiff appeared with counsel
11 and testified at a hearing held before the Honorable James P
12 Berry, Administrative Law Judge (ALJ) of the Social Security
13 Administration (SSA), on May 30, 2006. (A.R. 42-45, 47-52, 13,
14 391-414.) On August 4, 2006, the ALJ denied Plaintiff's
15 application for benefits. (Id. at 13-20.) After the Appeals
16 Council denied Plaintiff's request for review on March 26, 2007,
17 Plaintiff filed the complaint in this action on April 11, 2007.
18 (Id. at 5-8.) Briefing commenced on December 11, 2007, and was
19 completed on February 22, 2008, with the filing of Plaintiff's y
20 brief.

21     II. Standard and Scope of Review

22     Congress has provided a limited scope of judicial review of
23 the Commissioner's decision to deny benefits under the Act. In
24 reviewing findings of fact with respect to such determinations,
25 the Court must determine whether the decision of the Commissioner
26 is supported by substantial evidence. 42 U.S.C. § 405(g).

27

28      [1] On July 6, 2007, the Honorable Oliver W. Wanger assigned the case for all purposes to the undersigned
Magistrate Judge.

1  Substantial evidence means "more than a mere scintilla,"

2  Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a

3  preponderance, Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10

4  (9th Cir. 1975). It is "such relevant evidence as a reasonable

5  mind might accept as adequate to support a conclusion."

6  Richardson, 402 U.S. at 401. The Court must consider the record

7  as a whole, weighing both the evidence that supports and the

8  evidence that detracts from the Commissioner's conclusion; it may

9  not simply isolate a portion of evidence that supports the

10 decision. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir.

11 2006); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).

12 It is immaterial that the evidence would support a finding

13 contrary to that reached by the Commissioner; the determination

14 of the Commissioner as to a factual matter will stand if

15 supported by substantial evidence because it is the

16 Commissioner's job, and not the Court's, to resolve conflicts in

17 the evidence. Sorenson v. Weinberger, 514 F.2d 1112, 1119 (9th

18 Cir. 1975).

19      In weighing the evidence and making findings, the

20 Commissioner must apply the proper legal standards. Burkhart v.

21 Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must

22 review the whole record and uphold the Commissioner's

23 determination that the claimant is not disabled if the

24 Commissioner applied the proper legal standards, and if the

25 Commissioner's findings are supported by substantial evidence.

26 See, Sanchez v. Secretary of Health and Human Services, 812 F.2d

27 509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If

28 the Court concludes that the ALJ did not use the proper legal

1 standard, the matter will be remanded to permit application of

2 the appropriate standard. <u>Cooper v. Bowen</u>, 885 F.2d 557, 561 (9th

3 Cir. 1987).

4 //////

5     III. <u>Disability Findings</u>

6     In order to qualify for benefits, a claimant must establish

7 that she is unable to engage in substantial gainful activity due

8 to a medically determinable physical or mental impairment which

9 has lasted or can be expected to last for a continuous period of

10 not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). A

11 claimant must demonstrate a physical or mental impairment of such

12 severity that the claimant is not only unable to do the

13 claimant's previous work, but cannot, considering age, education,

14 and work experience, engage in any other kind of substantial

15 gainful work which exists in the national economy. 42 U.S.C.

16 1382c(a)(3)(B); <u>Quang Van Han v. Bowen</u>, 882 F.2d 1453, 1456 (9th

17 Cir. 1989). The burden of establishing a disability is initially

18 on the claimant, who must prove that the claimant is unable to

19 return to his or her former type of work; the burden then shifts

20 to the Commissioner to identify other jobs that the claimant is

21 capable of performing considering the claimant's residual

22 functional capacity, as well as her age, education and last

23 fifteen years of work experience. <u>Terry v. Sullivan</u>, 903 F.2d

24 1273, 1275 (9th Cir. 1990).

25     The regulations[2] provide that the ALJ must make specific

26 sequential determinations in the process of evaluating a

27

28

---

[2] All references to the Code of Federal Regulations are to the 2006 version unless otherwise stated.

disability: 1) whether the applicant engaged in substantial
gainful activity since the alleged date of the onset of the
impairment, 2) whether solely on the basis of the medical
evidence the claimed impairment is severe, that is, of a
magnitude sufficient to limit significantly the individual's
physical or mental ability to do basic work activities; 3)
whether solely on the basis of medical evidence the impairment
equals or exceeds in severity certain impairments described in
Appendix I of the regulations; 4) whether the applicant has
sufficient residual functional capacity, defined as what an
individual can still do despite limitations, to perform the
applicant's past work; and 5) whether on the basis of the
applicant's age, education, work experience, and residual
functional capacity, the applicant can perform any other gainful
and substantial work within the economy. See 20 C.F.R. § 416.920.

Here, the ALJ found that Plaintiff had severe impairments of
degenerative joint disease, carpal tunnel syndrome (CTS), and
major depressive disorder, but had no impairment or combination
thereof that met or medically equaled a listed impairment.
Plaintiff had the residual functional capacity (RFC) to lift
and/or carry twenty pounds occasionally and ten pounds frequently
and stand, walk, and sit six hours each in an eight-hour workday
with occasional climbing, balancing, stooping, kneeling,
crouching, and crawling and with occasional gross and fine
manipulation. Plaintiff could perform simple, repetitive tasks
(SRT); maintain attention and concentration, persistence, and
pace; relate to and interact with others; adapt to usual changes
in work settings; and adhere to safety rules. Plaintiff had no

past relevant work. Plaintiff was forty-seven years old on the date the application was filed and thus was a younger individual with limited education but with the ability to communicate in English; considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including children's attendant and usher. Thus, Plaintiff was not under a disability since October 22, 2003, the date Plaintiff's application was filed. (A.R. 13-20.)

IV. <u>Plaintiff's Medical History</u>

A. <u>Record relating to Physical Impairments</u>

In September 2003, Plaintiff visited the emergency department of the Kaweah Delta District Hospital for left rib pain without precipitating trauma. She exhibited normal strength and tone in the extremities and mild tenderness at the anterior and lateral lower ribs. (A.R. 132-33.)  An x-ray of the chest revealed moderate thoracic scoliotic deformity centered at T7/8 with concavity to the left. (A.R. 139.)

Radiologist Dr. Michael Bowers reported on October 2, 2003, that there was mild hypertrophic anterior spurring, mild cervical scoliosis, and moderate scoliosis in the upper thoracic spine. The cervical vertebral bodies were normal in height without compression fracture or subluxation. (A.R. 145, 194, 309-10.)

Dr. Ali at Hillman Health Center examined Plaintiff on October 13, 2003, and diagnosed osteoporosis among other things, and prescribed Bextra and an x-ray of the back. (A.R. 192.) An x-ray taken October 13, 2003, of the lumbar spine to rule out osteoporosis revealed a negative lumbar spine study with mild

calcification of the abdominal aorta. (A.R. 191, 308.) In

November 2003, Dr. Le examined Plaintiff and found some

tenderness to palpation in the lumbar area with reduced range of

motion secondary to pain; the assessment was chronic pack pain,

and Bextra was continued. (A.R. 190.)

On January 31, 2004, Dr. Benjamin Chang, M.D., a

consultative examiner who was board-certified in physical

medicine and rehabilitation, performed a comprehensive orthopedic

evaluation of Plaintiff. (A.R. 149-52.) Plaintiff complained of

chronic low back pain that occasionally radiated down the left

anterior thigh to the knee with associated numbness, and

bilateral hand numbness. Dr. Chang reviewed a disability report,

a chest x-ray, and a cervical spine x-ray dated September 30,

1998. (A.R. 149.) Plaintiff reported a cervical spine x-ray that

revealed degenerative disk disease and some scoliosis in the

thoracic spine, but there were no MRI's from the past; Plaintiff

had not had any physical therapy or injections, and she reported

that she cooked, washed dishes, and cleaned the house. (A.R. 149-

50.) She had some difficulty walking on toes and heels due to

pain and poor effort; lumbar flexion was zero to forty degrees,

extension zero to ten degrees, and lateral flexion zero to ten

degrees due to pain and poor effort. (A.R. 150.) Straight leg

raising was negative. There was mild tenderness on palpation over

the lower lumbar spine and crepitus in the left knee, but no

spasm, deformities, or effusion. Motor strength was grossly -5/5

in the left quadriceps and hamstrings, and otherwise 5/5 in the

bilateral extensor hallucis longus, gastrocnemius, and anterior

tibialis; Tinel's sign was positive on the right wrist, motor

strength was -5/5 with bilateral handgrips; and sensation was
decreased to pinprick in the bilateral hands. The diagnosis was
chronic low back pain, likely from degenerative arthritis, rule
out radiculopathy; rule out bilateral carpal tunnel syndrome,
especially on the right side, left knee osteoarthritis,
depression, and hypothyroidism. (A.R. 151-52.) Dr. Chang opined
that Plaintiff was expected to lift and carry ten pounds
frequently and twenty pounds occasionally; and stand, walk, and
sit for about six hours in an eight-hour workday with normal
breaks, with postural limitations of occasional bending,
stooping, crouching, crawling, pushing, and pulling, and
manipulative limitations of occasional reaching, handling,
feeling, and grasping with bilateral hands. (A.R. 152.)

On February 24, 2004, state agency medical consultant Dr.
Carmen E. Lopez opined that Plaintiff could occasionally lift
and/or carry twenty pounds, frequently lift or carry ten pounds,
stand and/or walk with normal breaks for a total of about six
hours in an eight-hour workday, sit with normal breaks for about
six hours in an eight-hour workday, and engage in unlimited
pushing and/or pulling, with only occasional climbing, stooping,
crouching, and crawling, but with frequent balancing and
kneeling, and with limited handling (gross manipulation),
occasional forceful grasping and twisting of both hands secondary
to complaints of parasthesias in both hand, CTS, and positive
Tinel's and motor strength of 5-/5 in bilateral hands; and only
occasional five-finger manipulation of both hands secondary to
parasthesias and pinprick to bilateral hands. (A.R. 173-82.)

On April 16, 2004, Mary Anderson, family nurse practitioner,

8

1  who had last seen Plaintiff on January 2, 2004, opined that
2  Plaintiff could lift and/or carry less than ten pounds
3  occasionally and frequently, stand and/or walk with normal breaks
4  for less than two hours in an eight-hour day, sit less than six
5  hours of an eight-hour workday with the need for alternate
6  periods of standing and sitting at breaks and lunch periods, and
7  never climb, balance, stoop, kneel, crouch, or crawl; these
8  limitations were due to sciatica and osteoporosis, with chronic
9  back pain also contributing to the postural limitations. (A.R.
10 183-84.) Nurse Anderson also assessed environmental restrictions.
11 (A.R. 184.) She saw Plaintiff again in April for back pain and
12 diagnosed chronic sciatica. (A.R. 189.) In May Plaintiff
13 complained of back and leg pain, numbness in the shoulder, and
14 pain with straight leg raising while sitting; medication was
15 continued. (A.R. 187, 290.)

16     On May 21, 2004, Michael Bowers, M.D., a radiologist,
17 reviewed an x-ray of the lumbosacral spine and opined that there
18 was mild loss of height of the L5-S1 interspace (mild narrowing)
19 and minimal lumbar scoliosis. (A.R. 199.)

20     On June 24, 2004, Dr. Glenn Ikawa, a state agency medical
21 specialist, affirmed that Plaintiff had a RFC for light work.[3]

22

23     [3] Light work is defined by 20 C.F.R. § 404.1567(b) (DIS) and
24 20 C.F.R. § 416.967(b)(SSI) as follows:

25     Light work involves lifting no more than 20
       pounds at a time with frequent lifting or carrying
26     of objects weighing up to 10 pounds. Even though
       the weight lifted may be very little, a job is
27     in this category when it requires a good deal of
       walking or standing, or when it involves sitting
28     most of the time with some pushing and pulling of
       arm or leg controls.

9

1      In June 2004, nurse practitioner Anderson prescribed

2  Neurontin and Valium for back pain and referred her to the

3  surgery clinic. (A.R. 297.) Medications were later adjusted.

4  (A.R. 296.)

5      In October 2004, nurse practitioner Anderson prescribed

6  Vicodin, Flexeril, Dexasom, and Toradol for Plaintiff's back pain

7  and ordered an MRI. (A.R. 315.)

8      Richard G. Anderson, M.D., a radiologist, interpreted an MRI

9  scan of the lumbar spine taken on November 1, 2004. It revealed

10  normal vertebral alignment, mild degenerative changes in the

11  lower lumbar spine, with moderate narrowing of the L5-S1 disk

12  space; left posterolateral herniation of the L5-S1 disk

13  encroaching upon the left intervertebral foramen, with only

14  encroachment upon the central spinal canal. The impression was

15  chronic degeneration of the disk with moderate narrowing of the

16  disk space, and the encroachment upon the central spinal canal

17  was only minimal. There was also a minimal midline posterior

18  bulging of the L4-5 disk, with decreased signal intensity but

19  without any localized herniation. The other disks were normal,

20  the spinal canal was normal in size and configuration, and the

21  conus medullaris was normal in position and appearance. (A.R.

22  295.)

23      In December 2004, Dr. Charles H. Boniske, M.D., interpreted

24  a bone scan which revealed that Plaintiff was below average for

25  age in all areas imaged and was in an osteoporotic range in the

26  LS spine putting her at a very high lifetime risk for fracture.

27  (A.R. 289.)

28      A chest x-ray taken in March 2005 was negative. (A.R. 324.)

1   Nurse practitioner Anderson provided Plaintiff with handouts on
2   exercises for her chronic lumbar back pain. (A.R. 320.)
3   Medications were adjusted. (Id.) In April 2005, Plaintiff
4   complained of bilateral hand numbness, and an EMG was ordered.
5   (A.R. 319.)

6        In May 2005, an EMG requested by Dr. Zeismer revealed an
7   abnormal study with compression neuropathy (carpal tunnel
8   syndrome) (CTS) of the median nerves across the wrist, which is
9   moderate on the left side and severe on the right side. There was
10  no evidence of polyneuropathy or ongoing cervical radiculopathy.
11  (A.R. 318.) She was subsequently referred to an orthopedist by
12  Dr. Nguyen. (A.R. 316.)

13       Dr. Arthur Zeismer, M.D., saw Plaintiff in a treating
14  capacity three times between October 17, 2005, and January 27,
15  2006, when he completed a residual functional capacity
16  questionnaire. (A.R. 335-37, 325-29.) Dr. Zeismer's treatment
17  notes of October 17, 2005, reflect that Plaintiff complained of
18  severe lower back pain and insomnia; Dr. Zeismer noted that an
19  MRI showed herniation of her disk, and he prescribed Vicodin for
20  pain relief. (A.R. 337.) He also referred Plaintiff to an "ortho"
21  for her carpal tunnel syndrome. (Id.)

22       V. Opinion of Dr. Zeismer

23       Plaintiff argues that the ALJ failed to state legally
24  adequate reasons, supported by substantial evidence, to support
25  his putting little weight on the opinion of Plaintiff's treating
26  physician, Dr. Arthur Zeismer, Jr.

27       The standards for evaluating the opinions of treating
28  sources are as follows:

> By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians. See 20 C.F.R. § 404.1527. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." Id. § 404.1527(d)(2). If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. Id. § 404.1527(d)(2)(i)-(ii). Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians. Id. § 404.1527(d)(1)-(2). Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record. Id. § 404.1527(d)(3)-(6).

Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007).

With respect to proceedings under Title XVI, the Court notes that an identical regulation has been promulgated. See, 20 C.F.R. § 416.927.

As to the legal sufficiency of the ALJ's reasoning, the governing principles have been recently restated:

> The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. Lester [v. Chater, 81 F.3d 821, 830 (9th

12

Cir.1995) (as amended).] Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. Id. (internal quotation marks omitted). Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. Id. at 830, quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.1983). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. Magallanes [v. Bowen, 881 F.2d 747, 751 (9th Cir.1989).] The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct. Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir.1988).
Reddick v. Chater, 157 F.3d 715, 725 (9th Cir.1998); accord Thomas, 278 F.3d at 957; Lester, 81 F.3d at 830-31.

Orn v. Astrue, 495 F.3d 625, 632 (9ᵗʰ Cir. 2007).

Dr. Zeismer opined that Plaintiff had bilateral carpal tunnel syndrome, severe low back pain, and left sciatica manifested by pain in both wrists, the lower back, and radiating down the left leg, which had lasted or could be expected to last at least twelve months. (A.R. 325.) No clinical findings, test results, or objective signs showing the impairments were mentioned by Dr. Zeismer, but he did state that he was giving her medical treatment and referred to getting her something (possibly surgery, but not fully legible) for carpal tunnel. (A.R. 326.) Plaintiff was not a malingerer; emotional factors, and psychological conditions of depression, anxiety, and unspecified psychological factors affected her physical condition. Her impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. Plaintiff's symptoms were severe enough to interfere with her attention and

concentration frequently to constantly; she could maintain
attention and concentration for thirty minutes at one time. (Id.)
Plaintiff was capable of low stress jobs, but no reason was
stated for the conclusion as to work stress. (A.R. 327.)
Plaintiff could walk two city blocks without rest or severe pain,
sit thirty minutes at one time and stand fifteen minutes at one
time without needing to change position, with a capacity to sit
and stand/walk for less than two hours total in an eight-hour
working day, with a need to include periods of walking around
every thirty minutes for ten minutes each time, to shift
positions at will from sitting, standing, or walking, and to take
unscheduled breaks during a workday for fifteen minutes every
half hour. (A.R. 327-28.) Plaintiff could never lift and carry
less than ten pounds; could only occasionally look down, turn her
head, look up, or hold her head in a static position; rarely
twist, stoop, crouch; and never climb ladders or stairs.
Plaintiff was significantly limited in performing repetitive
reaching, handling, or fingering. (A.R. 329.) Plaintiff's
impairments were likely to produce good days and bad days, and
she was estimated to be likely to be absent from work more than
four days per month because of her impairments or treatment. Dr.
Zeismer opined that Plaintiff had been subject to the foregoing
restrictions for one or two years. (Id.)

     The ALJ expressly addressed the opinion evidence in the
case, placing great weight on the opinions of state agency
medical consultants who had concluded that Plaintiff could
perform simple, routine work activity on a sustained basis, was
able to interact with others and adapt to changes in work

1 settings, and retained the RFC to lift and/or carry twenty pounds

2 occasionally and ten pounds frequently, and stand, walk and sit

3 six hours in an eight-hour day, with occasional climbing,

4 stooping, crouching and crawling and with occasional forceful

5 grasping, twisting, and fine finger manipulation with both hands.

6 (A.R. 18.) The ALJ also placed great weight on the opinion of

7 consultative orthopedist Dr. Chang, who concluded that Plaintiff

8 could perform work at the light exertional level with occasional

9 postural and manipulative limitations. (Id.) The ALJ also noted

10 the opinion of consultative psychologist Dr. McDonald, who

11 concluded that Plaintiff had probable average to low average

12 intellectual ability but would be able to be employed in terms of

13 her cognitive ability. (Id.)

14   With respect to Dr. Zeismer's opinion, the ALJ stated:

15 Little weight given (sic) to the opinion of Dr.
   Zeismer Jr. who concluded that the claimant's residual

16 functional capacity was at a less than sedentary level
   of exertion (citation omitted). His opinion is not

17 supported by the objective medical evidence. It appears
   that Dr. Zeismer Jr. has only treated the claimant for

18 a short period of time (citation omitted) as all the
   other medical records are signed by physician assistant

19 Hung Ngo and nurse practitioner Mary Anderson under
   the supervision of Drs. Nguyen Le, Ali and Sunio

20 (citations omitted). Little weight also given (sic)
   to the opinion of Mary Anderson, FNP who also concluded

21 that the claimants' residual functional capacity was at
   a less than sedentary level of exertion (citation

22 omitted). Her opinion is also not supported by the
   objective medical evidence. Although she based her

23 opinion on a diagnosis of sciatica and osteoporosis
   x-ray of the lumbar spine does not show any encroachment

24 of a nerve root and there is no mention of osteoporosis
   in the x-ray report (citation omitted).

25
26 (A.R. 18.)

27   The path of analysis required to be followed by an ALJ is

28 established. The ALJ was first required to determine whether or

1 not the opinion of the treating physician would be given

2 controlling weight, which in turn required consideration of

3 whether or not the treating physician's opinion was well-

4 supported by medically acceptable clinical and laboratory

5 diagnostic techniques and was not inconsistent with the other

6 substantial evidence in the case record. Orn, 495 F.3d at 631.

7     If not given controlling weight, the opinion was then

8 subject to consideration in light of other specified factors,

9 including the nature and extent of the treatment relationship,

10 the amount of relevant evidence that supported the opinion, the

11 quality of the explanation provided, the consistency of the

12 opinion with the record as a whole, the specialty of the doctor

13 providing the opinion, and other factors such as the degree of

14 understanding of the Commissioner's disability programs and their

15 evidentiary requirements and the degree of his or her familiarity

16 with the other information in the record. Orn, 495 F.3d at 631.

17     The Court has reviewed the record at length and concludes

18 that the reasons given by the ALJ were not supported by

19 substantial evidence in this case and did not rise to the level

20 of specific and legitimate reasons required for rejection of the

21 treating doctor's opinion.

22     With respect to Plaintiff's degenerative joint disease, it

23 is true that the objective evidence in the early medical record

24 regarding 2003 and 2004 was still generally consistent with less

25 serious conditions and limitations; it was characterized by

26 reports of mild symptoms and by x-rays that reflected only mild

27 or moderate symptoms in the thoracic and cervical spines, and a

28 negative lumbar study. Even in May 2004, an x-ray of the

lumbosacral spine reflected only mild loss of height and mild narrowing of the L5-S1 interspace and minimal lumbar scoliosis. Thus, when Dr. Chang examined Plaintiff and rendered his consulting opinion in January 2004, it was supported by some objective medical evidence.

However, in November 2004, the more comprehensive MRI study reflected a more serious condition, including moderate narrowing of the L5-S1 disk space, herniation of the disk, encroachment upon the left intervertebral foramen and mild encroachment upon the central spinal canal, and posterior bulging of the L4-5 disk. "Encroachment" is defined as an intrusion into a space beyond desirable or normal limits. Webster's Third New International Dictionary of the English Language Unabridged (2002) p. 747. An intervertebral foramen is the passage formed by the inferior and superior notches on the pedicles of adjacent vertebrae; it transmits a spinal nerve and vessels. Dorland's Illustrated Medical Dictionary (28th ed. 1994) p. 649. Thus, the objective medical evidence had significantly changed by the time Dr. Zeismer rendered his opinion in January 2006. Dr. Zeismer's opinion when rendered was well-supported by medically acceptable clinical and laboratory diagnostic techniques; in view of the dramatic addition of the MRI, Dr. Chang's opinion was no longer supported by the pertinent objective medical evidence of record.

The ALJ gave the opinion of examining Dr. Chang great weight. (A.R. 18.) However, he did not state any reason for that evaluation. Even if it could be inferred that by implication the ALJ found that Dr. Chang's opinion was supported by the objective medical evidence, then this would be true only in the sense that

1  in his examination, Dr. Chang observed some objectively
2  ascertainable signs; further, the relatively mild objective test
3  results that existed at the time of Dr. Chang's opinion were also
4  consistent with Dr. Chang's opinion. However, it must be
5  emphasized that Dr. Chang rendered his opinion before the key
6  objective diagnostic tests were even run. Further, Dr. Chang's
7  diagnosis was at best uncertain. He diagnosed Plaintiff's chronic
8  low back pain as "likely from degenerative arthritis, rule out
9  radiculopathy." (A.R. 151.) Likewise, as will be noted in the
10 analysis of Plaintiff's CTS that follows, Dr. Chang diagnosed
11 that condition tentatively as well: "Rule out bilateral carpal
12 tunnel syndrome, especially on the right side." (A.R. 151.)

13      The ALJ also gave great weight to the opinions of the state
14 agency medical consultants who found Plaintiff capable of light
15 work. (A.R. 18.) Again, no reason was stated for this conclusion.
16 As was the case with Dr. Chang, the state agency consultants
17 rendered their opinions before the MRI and EMG testing occurred.
18 Their opinions thus rely on the early objective tests and Dr.
19 Chang's opinion, and thus they suffer from the same defect that
20 Dr. Chang's did. They cannot said to be substantial after key
21 diagnostic tests not only substantiated Plaintiff's condition,
22 but also reflected severe to moderate extent or intensity that
23 was unanticipated earlier in the process of diagnosis and
24 treatment.

25      The Court thus concludes that in the pertinent respects, Dr.
26 Zeismer's opinion was not inconsistent with the other substantial
27 evidence in the record.

28      Although the ALJ also reasoned that Dr. Zeismer had only

1  been Plaintiff's treating physician for a short period of time

2  (A.R. 18), that reason is of relatively little probative force in

3  the context of this case, in which the ALJ credited the opinion

4  of Dr. Chang, who examined Plaintiff only once and reviewed

5  medical records consisting only of a disability report (source

6  and nature unstated), a chest x-ray, and a cervical spine x-ray

7  from September 1998. (A.R. 149.) The degree of familiarity with

8  the patient and the medical record are important factors to be

9  weighed, but here they do not support the ALJ's conclusions.

10     The Court thus concludes that the ALJ failed to state

11  specific and legitimate reasons, supported by substantial

12  evidence, for rejecting Dr. Zeismer's opinion concerning

13  Plaintiff's degenerative disease of the spine.

14     With respect to Plaintiff's CTS, Dr. Zeismer based his

15  opinion on the EMG performed in May 2005, which revealed severe

16  CTS on the right and moderate CTS on the left. Not only did the

17  EMG not rule out CTS, as Dr. Chang had suggested in his

18  diagnosis, but it revealed that Plaintiff had serious CTS. Thus,

19  with respect to Dr. Zeismer's opinion concerning Plaintiff's CTS,

20  the ALJ's reasoning that Dr. Zeismer's opinion was not supported

21  by the objective medical evidence (A.R. 18) is not specific and

22  legitimate or supported by substantial evidence in the record.

23  This is a case like Orn v. Astrue, 495 F.3d 625, 633-34 (9th Cir.

24  2007), in which the treating physician's opinion was the only one

25  addressing the most significant medical event, which here is the

26  appropriate diagnostic test that revealed a severe condition.

27     The Court concludes that the ALJ's reasons for rejecting the

28  opinion of Dr. Zeismer regarding Plaintiff's CTS were not

1  specific and legitimate and were not supported by substantial
2  evidence in the record. Dr. Zeismer's opinions were well-
3  supported by medically acceptable clinical and laboratory
4  diagnostic techniques, and they were not inconsistent with the
5  other substantial evidence in the case record. The ALJ erred in
6  not giving Dr. Zeismer's opinion controlling weight.

7      VI. Opinion of Nurse Practitioner Mary Anderson

8      Plaintiff challenges the ALJ's rejection of the opinion of
9  nurse Anderson that Plaintiff could perform less than sedentary
10 work. The ALJ stated that he gave little weight to Anderson's
11 opinion because it was not supported by the objective medical
12 evidence; she had based her opinion on a diagnosis of sciatica
13 and osteoporosis, but an x-ray of the lumbar spine did not show
14 any encroachment of a nerve root, and there was no mention of
15 osteoporosis in the x-ray report (Exhibit 9F, p. 1). (A.R. 18.)

16     The ALJ did not make any findings based on Anderson's status
17 as a nurse practitioner, but rather based his assessment on the
18 medical record. As previously discussed, the objective medical
19 evidence included significant test results that supported Dr.
20 Zeismer's opinion of less than sedentary capacity and some
21 nonexertional limitations.

22     The absence of any encroachment of a "nerve root" was not
23 the subject of, or ascertainable basis for, any medical opinion
24 in the record. There is no basis for the ALJ's conclusion that
25 the objective medical evidence considered by Anderson and Zeismer
26 was insufficient to support a sedentary RFC simply because there
27
28

1   was no encroachment of a nerve root.[4] The only physician who

2   considered the presence of encroachment upon the spinal

3   structures was Dr. Zeismer (A.R. 337), who concluded that the

4   Plaintiff's condition rendered her unable to perform even

5   sedentary work.

6       The Court concludes that the ALJ's reasoning concerning the

7   absence of any nerve root encroachment was not specific and

8   legitimate in force.

9       With respect to osteoporosis, the x-ray report referred to

10  by the ALJ (Exhibit 9F p. 1 [A.R. 199]) was rendered in May 2004

11  and reflected no information on bone density. However, in

12  December 2004, a bone scan revealed osteoporosis in the LS spine

13  that put Plaintiff at a very high lifetime risk for fracture.

14  (A.R. 289.) Thus, although it was true that no osteoporosis was

15  noted in the x-ray report focused on by the ALJ, that datum loses

16  force and legitimacy in light of the later report that clearly

17  reflected osteoporosis of the lumbosacral spine, the area in

18  which Plaintiff had significant degenerative process and

19  structural abnormalities. Thus, the ALJ failed to state

20  legitimate reasons for rejecting Anderson's opinion.

21      VII. Opinion of Dr. Chin

22      Plaintiff argues that the ALJ improperly rejected the

23  ────────────────

24      [4]The Court notes that the MRI did indeed reflect that a
    herniated disk encroached upon the left intervertebral foramen
25  and upon the central spinal canal; it is not clear that there was
    actual encroachment on the root of a nerve, as distinct from
26  encroachment onto a nerve itself or into the foramen or central
    spinal canal, which carry or may constitute nerve tissue.
27  Further, there is no expert testimony in the record regarding the
    functional significance of the varying degrees or locations of
28  encroachment.

opinion of treating psychiatrist Dr. Samuel Chin that Plaintiff had marked limitations in the ability to work in coordination within a proximity to others without being distracted by them, and the ability to travel in unfamiliar places or use public transportation, and moderate limitations in many other areas of endeavor that affect the performance of basic work activities on a daily basis.

The ALJ rejected Dr. Chin's opinion regarding Plaintiff's marked limitations because the opinion was contrary to treating notes generated at the time that reflected returning from a trip on which Plaintiff had a wonderful time, attending a friend's funeral, driving her sister to Mexico for cosmetic surgery, helping her husband with his mother, and enjoying being around her new grandchild. (A.R. 18.) He also relied on recent treatment reports that Plaintiff took care of chores, shopping, managing finances in light of her husband's being disabled on Supplemental Security Income (SSI), babysitting with her grandchild, and staying with her daughter for seven days. (Id.) The ALJ further reasoned that on several occasions, she reported that she was stable on her medication, was mentally doing well, and was very busy with her bird. (Id.) The ALJ concluded that these activities undercut Dr. Chin's assessment.

A longitudinal view of Plaintiff's medical record concerning her mental impairments reflects that Plaintiff's conditions markedly improved between 2003 and 2006.

At intake at Tulare County Health and Human Services Agency in October 2003, Plaintiff was diagnosed with post-traumatic stress disorder (PTSD) stemming from an accident in 1997,

1  insomnia, major depressive disorder, recurrent, moderate, with a

2  global assessment of functioning of sixty currently (moderate

3  limitations) and seventy-five in the past (only slight

4  impairments).[5] (A.R. 270-78.) She underwent therapy with a

5  psychiatrist and a LCSW in 2003 and 2004, with a GAF in December

6  2003 of fifty-five, and with increased anxiety and panic attacks

7  in 2004. (A.R. 258-66.)

8      Although Plaintiff was able to take a car trip with her

9  sister to Mexico in early 2004, she felt PTSD, detachment,

10 distressing images of her accident, inability to sleep, and

11 extreme feelings of danger and hyper-vigilance. (A.R. 254.) In

12 March 2004, treating psychiatrist Dr. Kamali concluded that

13 Plaintiff's depressive symptoms had responded to Paxil with some

14 residual symptoms, and she should be more active in the

15 community. (A.R. 247-251.) She was doing well in many ways in May

16 2004 and was pleased with her medications; however, she became

17 physically ill when she attempted to attend group therapy. (A.R.

18 244, 247.) She later attended some group therapy and by July 2004

19 was able to take a trip with her sister and enjoyed it; she had

20 few symptoms. Her treatment plan was modified to end group

21 therapy, continue with clinic for ongoing medication therapy, and

22 plan short therapy in the future if depression began to return.

23 (A.R. 230.) In August 2004, Plaintiff found the depression class

24

25      [5] A GAF, or global assessment of functioning, is a report of a
clinician's judgment of the individual's overall level of functioning that is
used to plan treatment and to measure the impact of treatment as well as to

26 predict its outcome. American Psychiatric Association, Diagnostic and
Statistical Manual of Mental Disorders at 32, 34 (4th ed., text revision)

27 (DSM-IV-TR). A GAF of fifty-five or sixty reflects moderate symptoms or
difficulties; a GAF of seventy-five reflects only transient and expectable

28 reactions to psycho-social stressors that result in no more than slight
impairment in social, occupational, or school functioning. Id. at 34.

1  she had attended to be helpful and reported having developed new

2  skills to control her symptoms of depression, which continued

3  along with panic attacks; she was better able to function in her

4  community. (A.R. 224.) In October 2004, Dr. Chin found that

5  Plaintiff had improved. (A.R. 221.)

6  In January 2005, Dr. Chin found that a mental status exam

7  was normal with no problems; Plaintiff reported that she felt

8  good. (A.R. 376.) In February 2005, Plaintiff reported to Dr.

9  Chin that she had been busy, was reading a lot, felt good, was

10 able to stay with her daughter for seven days, had no problems

11 with anger, and was too busy to think about it; her medication,

12 Effexor, which had been increased, was better than the Paxil. Dr.

13 Chin noted "marked improvement." (A.R. 373.) Plaintiff's spouse

14 reported that Plaintiff was shopping and doing fine in March

15 2005. (A.R. 371.) Plaintiff reported that she was a little

16 depressed in May 2005, but she was staying busy with her bird and

17 read a lot. (A.R. 368.) She reported that her medications were

18 effective, although she had withdrawal symptoms when she ran out

19 of medication. (A.R. 364.) In July a mental status exam was

20 normal, and Dr. Chin reported that Plaintiff was handling things

21 "OK" despite stressors of two family members' suffering cancer.

22 (A.R. 358.) Plaintiff reported some medication concerns and

23 inability to sleep in September 2005; she was advised to try

24 relaxation exercises but resisted the suggestion. (A.R. 354.) She

25 reported that generally she had been doing well despite the death

26 of her brother-in-law from cancer and her younger brother's

27 cancer; the medicine was helping; she babysat her grandson and

28 tried to keep busy at home. (A.R. 352.)

In January 2006, it was reported that Plaintiff was stable
on the treatment regimen, so it would be continued. (A.R. 345.)
She was doing well, with effective medications that produced no
side-effects. (A.R. 344.) Her progress was "stable." (Id.) In
March she reported being stable. (A.R. 342.) Plaintiff reported
that she took care of chores and shopping and managed her
finances; drove to appointments and went out to dinner with her
husband; ate well; suffered poor sleep because of back pain; and
desired to go out and be around people in order to work on her
anxious episodes. (A.R. 340-41.) She was doing fair, medications
were effective, and her progress was stable. (A.R. 338.)

There were conflicting opinions in the medical record
concerning Plaintiff's RFC with respect to her mental impairment.
There were opinions that Plaintiff could maintain simple,
repetitive employment. State agency medical consultant and
psychiatrist, Dr. Achimedes Garcia, opined in February 2004 that
Plaintiff was moderately limited in the ability to understand,
remember, and carry out detailed instructions but was not
otherwise significantly limited in memory and understanding,
sustained concentration and persistence, social interaction, or
adaptation; Plaintiff was able to perform simple, routine work
activity on a sustained basis, and she could relate and adapt.
(A.R. 155, 153-58.) In the psychiatric review technique completed
the same day (A.R. 159-72), Dr. Garcia assessed affective and
anxiety-related disorders that resulted in mild restriction of
daily living, mild to moderate difficulties in maintaining social
functioning, and mild difficulties in maintaining concentration,
persistence, or pace. (A.R. 169.) On June 24, 2004, Dr. Glenn

Ikawa, M.D., state agency medical consultant, reviewed all the evidence in the file and the assessment of February 20, 2004, and affirmed Dr. Garcia's assessment as written. (A.R. 159.)

There was also the opinion of Dr. Mary K. McDonald, Ph.D., who performed a consultative mental status evaluation of Plaintiff akin to a psychiatric evaluation in January 2004. (A.R. 145-48.) A mental status exam revealed cognitive or intellectual ability of probably average to low average, orientation in all three spheres, depressed mood, no impairment of recent or long-term memory, no bizarre thought process or homicidal or suicidal ideation, and clear and readily understandable speech. Her depression appeared to have been present throughout her life and to relate to the accident and associated post-traumatic stress with flashbacks and recollections, as well as to back pain and loss of mobility. The diagnosis was major depressive disorder, recurrent, and PTSD with a global assessment of functioning (GAF) of sixty. (A.R. 148.) Dr. McDonald opined that her employment might be hampered by her physical disorder and depression; however, no precise functional limitations were set forth. (Id.)

Dr. Chin's assessment of August 2004 was that for a year Plaintiff had suffered various limitations, including slight limitations in the ability to understand, remember, and carry out detailed instructions, sustain an ordinary routine without special supervision, and make simple work-related decisions; moderate limitations in the ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual with customary allowances, complete a normal workday and work week

without interruptions from psychologically based symptoms,
perform at a consistent pace without an unreasonable number and
length of rest periods, interact appropriately with the general
public, accept instructions and respond appropriately to
criticism from supervisors, get along with coworkers or peers
without distracting them or exhibiting behavioral extremes, and
respond appropriately to changes in the work setting; and marked
limitations in the ability to work in coordination within a
proximity to others without being distracted by them and to
travel in unfamiliar places or use public transportation. (A.R.
330-34.) Although she had anxiety around people in general, she
could perform simple tasks away from others. (A.R. 334.)

Because the opinion of treating psychiatrist Dr. Chin was
contradicted by other experts, the ALJ was required to set forth
specific, legitimate reasons to support his rejection of the
treating physician.

It is established that inconsistency of treating notes with
an opinion is a valid basis for rejecting an opinion. It is
appropriate for an ALJ to consider the absence of supporting
findings, and the inconsistency of conclusions with the
physician's own findings, in rejecting a physician's opinion.
Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995); Matney
v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992); Magallanes v.
Bowen, 881 F.2d 747, 751 (9th Cir. 1989). Further, activities of
daily living that are inconsistent with the limitations may be
considered. It is permissible to rely on the Plaintiff's
testimony regarding her impairments in discrediting a treating
physician's opinion. Fisher v. Schweiker, 568 F.Supp. 900, 903

1  (N.D.Cal. 1983).

2      Here, treating notes from around August 2004, when Dr. Chin

3  rendered his opinion, reflect that Plaintiff was able twice to

4  travel to Mexico, having a wonderful time once but having

5  flashbacks and anxiety on another trip (A.R. 230 [July 2004]),

6  and she experienced improvement of depressive symptoms and panic

7  attacks with better control and function (A.R. 224 [August 16,

8  2004]). She reported the ability to clean and help her husband

9  with his mother despite some nightmares and flashbacks (A.R. 221

10 [October 2004]) and to be busy with her grandchildren despite

11 depression (A.R. 218 [October 2004]). Although Plaintiff did

12 simultaneously report some symptoms and problems, the record

13 supports the ALJ's reasons concerning Plaintiff's activities, and

14 specifically her activities of traveling to unfamiliar places and

15 being around people.

16     The record also supports the ALJ's reasoning that Plaintiff

17 had reported that she was stable on her medication, was doing

18 well, and was busy with her bird. (A.R. 18.) The record reflects

19 improvement of Plaintiff's sleep to the point of its being no

20 problem in December 2004. (A.R. 207.) After beginning Effexor in

21 December (id.), Plaintiff continued therapy. Dr. Chin's mental

22 status exam of January 2005 was normal and devoid of problems;

23 medications were adjusted. (A.R. 376.) Plaintiff reported she had

24 been very busy with her bird and liked to read a lot; she felt

25 good. (A.R. 374.) In February she reported to Dr. Chin that she

26 felt pretty good, was handling her crying better, had not been as

27 tired, was able to stay with her daughter for seven days, had no

28 problems with anger, and was too busy to think about it; Effexor,

28

which had been increased, was better than the previous Paxil and was effective. Dr. Chin noted "marked improvement." (A.R. 373.) Plaintiff's spouse reported she was out shopping and was doing fine in March 2005. (A.R. 371.) Plaintiff reported being a little depressed in May 2005 but was staying busy with her bird and read a lot. (A.R. 368.) She reported her medications were effective. (A.R. 364.) In July a mental status exam was normal, and Dr. Chin reported that Plaintiff was handling things "OK" despite stressors of two family members' suffering cancer. (A.R. 358.) Plaintiff reported some medication concerns and inability to sleep in September 2005; she was advised to try relaxation exercises but resisted the suggestion. (A.R. 354.) She reported that generally she had been doing well despite the death of her brother-in-law from cancer and her younger brother's cancer; the medicine was helping; she babysat her grandson and tried to keep busy at home. (A.R. 352.)

     In January 2006, it was reported that Plaintiff was stable on the treatment regimen, so it would be continued. (A.R. 345.) She was doing well, with effective medications that produced no side-effects. (A.R. 344.) Her progress was "stable." (Id.) In March she reported being stable. (A.R. 342.) Plaintiff reported that she took care of chores and shopping and managed her finances; drove to appointments and went out to dinner with her husband; ate well but suffered poor sleep because of back pain; and desired to go out and be around people in order to work on her anxious episodes. (A.R. 340-41.) She was doing fair, medications were effective, and her progress was stable. (A.R. 338.)

1    The record reveals a steady and documented course of
2 improvement of Plaintiff's mental condition after Dr. Chin's
3 assessment of August 2004.

4    The Court concludes that the ALJ stated specific and
5 legitimate reasons, supported by substantial evidence, for
6 rejecting the functional limitations found by Dr. Chin.

7    VIII. <u>Failure to Articulate Review of Lay Statements</u>

8    Plaintiff argues that the ALJ erred in failing to mention
9 the report of Plaintiff's husband prepared on April 12, 2004.
10 (A.R. 102-09.) Mr. Everett reported that Plaintiff slept poorly
11 and needed to be reminded to take her medication, go places, and
12 pay bills; she cooked once a week, could not stand, took a long
13 time with chores and experienced pain thereafter, drove but could
14 not drive because of pain, had problems getting along with
15 others, got angry easily, did not engage in activities she
16 formerly enjoyed, suffered limitations in numerous specified
17 physical and mental functions, had limited attention, needed
18 persons to accompany her, and could not do much of anything.

19    Review of the ALJ's opinion shows no reference to this
20 material. However, it is established that lay witnesses, such as
21 friends or family members in a position to observe a claimant's
22 symptoms and daily activities, are competent to testify to a
23 claimant's condition; the Commissioner will consider observations
24 by non-medical sources as to how an impairment affects a
25 claimant's ability to work. <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918-
26 19 (9th Cir. 1993). An ALJ cannot discount testimony from lay
27 witnesses without articulating specific reasons for doing so. <u>Id.</u>
28 at 919.

1  The Court thus concludes that the ALJ erred in not
2  addressing and making findings, supported by legally sufficient
3  reasons, concerning the statements of Plaintiff's husband.

4  Defendant argues that this error is harmless because the
5  husband's statements were based on information that Plaintiff
6  gave to him, the ALJ expressly rejected Plaintiff's own claims of
7  similar limitations, and thus it follows either that the ALJ
8  would not have credited the evidence, or that the evidence simply
9  should not be credited by this Court.

10  The ALJ rejected Plaintiff's claims of disabling limitations
11  because of her wide range of activities of daily living, lack of
12  compliance with attending her depression group therapy and
13  individual therapy sessions, and failure to obtain treatment
14  consistent with chronic back pain.

15  Defendant's argument is premised upon the assumption that
16  Plaintiff gave the information related by her husband to her
17  husband. However, it is just as likely that the husband
18  independently observed most of the phenomena to which his
19  statements related.

20  Further, Defendant's argument amounts basically to an
21  assertion that if the ALJ had wanted to, the ALJ could have found
22  reasons in the record for discounting this evidence and would
23  have done so. The problem is, however, that the ALJ completely
24  failed to make any finding regarding this important evidence. It
25  is true that once an ALJ expressly rejects testimony of lay
26  witnesses, the statement of arguably germane reasons for
27  dismissing the evidence will be found sufficient even if not
28  clearly linked to the determination. See Lewis v. Apfel, 236 F.3d

31

1  503, 511-12 (9th Cir. 2001). Here, however, review of the ALJ's
2  decision shows no reference to consideration or evaluation of the
3  lay evidence; there are no findings to review. This Court is
4  limited to reviewing the findings of the ALJ and to reviewing the
5  specific facts and reasons that the ALJ asserts. Connett v.
6  Barnhart, 340 F.3d 871, 874 (9th Cir. 2003). The district court
7  cannot make findings for the ALJ. Id.

8      Where an ALJ's error consists of a failure to discuss
9  evidence favorable to the claimant, a reviewing court cannot
10 consider the error harmless unless it can confidently conclude
11 that no reasonable ALJ, when fully crediting the testimony, could
12 have reached a different disability determination. Stout v.
13 Commissioner, 454 F.3d 1050, 1056 (9th Cir. 2006). The Court
14 cannot confidently conclude that the ALJ would have used
15 Plaintiff's conservative treatment and her activities of daily
16 living to reject Plaintiff's husband's observations.

17     Accordingly, the Court concludes that in this instance, the
18 error is not harmless.

19     IX. Vocational Expert's Testimony

20     Plaintiff argues that because the ALJ found that Plaintiff
21 was limited to simple, repetitive tasks, the testimony of the
22 vocational expert (VE) that Plaintiff could perform jobs that
23 require a reasoning level "2" on the scale of the Dictionary of
24 Occupational Titles (DOT) conflicted with the DOT and did not
25 constitute substantial evidence.

26     The Court does not reach this argument because it has
27 determined that the opinion of the treating sources regarding
28 Plaintiff's physical impairments was wrongfully rejected. In the

present case, the VE testified that if Plaintiff had the limitations posed by nurse Anderson and Dr. Zeismer, her treating sources, she could not perform any work in the national economy. (A.R. 410, 413.) Therefore, the status of the VE's evidence concerning any specific functional limitation that affected Plaintiff's RFC as limited solely by Plaintiff's mental impairment is not determinative and is unnecessary to the decision.

X. Remedy

The Court must determine the appropriate remedy in light of the multiple errors found to have been committed by the ALJ.

A district court is authorized to affirm, modify, or reverse a decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g). The decision whether to remand a matter pursuant to sentence four of § 405(g) or to order immediate payment of benefits is within the discretion of the district court. Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000). Where the ALJ has failed to provide legally sufficient reasons for rejecting the opinion of treating sources, and there are no outstanding issues that must be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited, then the evidence should be credited and an immediate award of benefits directed. Smolen v. Chater, 809 F.3d 1273, 1292 (9th Cir. 1996).

Here, in view of the VE's testimony, it is clear that the ALJ would be required to find Plaintiff disabled if the opinions of her treating sources were credited.

33

1   There does not appear to be any outstanding issue that would
2   require a remand for further proceedings. With respect to SSI,
3   because SSI payments are made beginning with the date of
4   application, the onset date in an SSI case is ordinarily
5   established as of the date of filing, provided that the claimant
6   was disabled on that date. Soc. Sec. Ruling 83-20. Exceptions are
7   where the evidence shows that the onset date was subsequent to
8   the date of filing, or where there is a problem requiring
9   ascertainment of duration. Id.

10   Here, Plaintiff applied for SSI on October 22, 2003, and
11   alleged disability since July 1, 2002. Dr. Zeismer's opinion of
12   January 2004 was that Plaintiff had been limited as he opined for
13   a year or two. Thus, in this case, there is no necessity of
14   determining onset.

15   Therefore, because there is no purpose to be served by a
16   remand, the Commissioner should be ordered directly and forthwith
17   to award Plaintiff benefits as prayed from October 22, 2003,
18   onward.

19   XII. Disposition

20   Accordingly, it IS ORDERED that

21   1) Plaintiff's Social Security Complaint IS GRANTED; and

22   2) The decision of the Commissioner denying Plaintiff's
23   application for benefits IS REVERSED; and

24   3) The matter IS REMANDED to the Commissioner of Social
25   Security with directions to award forthwith SSI benefits from
26   October 22, 2003, forward; and

27   /////

28   //////

34

1        4)  Judgment BE ENTERED for Plaintiff Geneva J. Evrett and

2   against Defendant Michael J. Astrue.

3   IT IS SO ORDERED.

4   **Dated:    August 28, 2008**                 **/s/ Sandra M. Snyder**
                                         UNITED STATES MAGISTRATE JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28